CSP, formerly CSC, Appellant (Plaintiff),

v.

DDC, Appellee (Defendant).

No. C–91–10.

Supreme Court of Wyoming.

Nov. 30, 1992.

John M. Burman, Faculty Supervisor, University of Wyoming Legal Services Program, and Kevin D. Huber (argued), Student Intern, for appellant.

John M. Scorsine and William Ince (argued), Legal Asst., Rock Springs, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

CARDINE, Justice.

CSP appeals from an order of the trial court which denied her petition to modify her decree of divorce to give her custody of her minor children, FP and MJP. She specifically challenges the court's refusal to declare the non-existence of a father-child relationship between her ex-husband, DDC, and MJP. The trial court found that CSP was barred by res judicata and collateral

\* Chief Justice at time of oral argument.

estoppel from challenging the provision of a previously-stipulated modification establishing DDC's paternity of MJP.

We affirm the order of the trial court.

CSP states the issues in this way:

I. Whether the failure to comply with the Wyoming Parentage Statutes renders a determination of paternity void?

II. Whether an order of dismissal may be based on a void judgment?

III. Whether a party with "unclean hands" may invoke the doctrines of res judicata or collateral estoppel?

Appellee's statement of the issues perhaps better identifies the issues to be considered as they relate to the particular facts and circumstances of this case:

I. Whether the stipulation agreement entered into by [CSP] and [DDC] and the resulting modification order entered by the District Court violate the Wyoming Parentage Act?

II. Whether the doctrines of res judicata, collateral estoppel, and judicial estoppel operate to prevent appellant from further litigating the issue of paternity of [MJP]?

III. Whether appellee is barred from asserting the equitable theories of res judicata, collateral estoppel and judicial estoppel by the unclean hands doctrine?

IV. Whether the district court committed reversible error in dismissing appellant's Motion to Modify Divorce Decree?

No transcription of the proceedings in this case was made; instead, the essential facts are presented for our review by means of a "Settled and Approved Statement of Evidence and Proceedings." *See* W.R.A.P. 4.03. CSP is the mother of three children: NP, born May 8, 1984; FP, born September 20, 1985; and MJP, born (one month prematurely) on December 5, 1986. CSP married DDC, the appellee, on March 1, 1985. DDC is not the biological father of NP, who was born before the marriage. He is, however, the father of FP, who was born during the marriage.

The parties were divorced on July 11, 1986. The divorce decree recited that one child, FP, had been born as the result of the marriage. The court awarded custody of FP to CSP. Approximately five months after the entry of the decree, MJP was born. Because MJP was born within 300 days (148 days to be exact) of the end of the marriage, DDC is presumed to be her natural father. W.S. 14–2–102(a)(i) (July 1986 Repl.).

CSP underwent some hard times after the divorce. She began receiving welfare in September 1986. By January 1988, she found herself and the children in an unhealthy living arrangement. She and her boyfriend were both using drugs, and her boyfriend was selling them. CSP arranged for her children to be taken care of by relatives: NP went to live with CSP's father in Oklahoma, FP went to live with DDC, and MJP went to live with CSP's mother, SG.

CSP was later convicted of using marijuana. She also failed to appear on a felony forgery charge in Nebraska. Apparently, these crises convinced her to try to fix her life situation. She returned to Wyoming, got off the drugs, and started to collect her children back together. She got NP and FP back, but her mother did not want MJP to return living with CSP because CSP was living in the home of DDC's mother.

CSP's mother, SG, sent a letter to CSP threatening to start an adoption of MJP. When DDC and his mother learned of this, DDC took CSP to Mr. Pickett, the attorney who had represented him in the divorce from CSP. Mr. Pickett advised CSP that if she and DDC would stipulate to DDC being MJP's father, that might stop the adoption proceedings. CSP knew that DDC was not MJP's natural father, but she agreed to sign an acknowledgement of paternity which named DDC as the father. CSP claims Mr. Pickett was made aware that DDC was not MJP's father prior to the filing of the acknowledgement with the court. This acknowledgement, along with a verified petition to establish paternity and a stipulation to modify the divorce decree, was filed with the court on November 10, 1988. That same date, the court signed an order adopting the stipulation to modify the divorce decree, which named MJP as a child of the marriage and granted physical custody of both children to DDC.

CSP then retrieved MJP from SG. SG went ahead with the adoption proceedings for MJP, but abandoned them after CSP was granted temporary custody of MJP at a temporary custody hearing in the adoption proceeding. CSP thought that, since she had won at the adoption proceedings, the modification was no longer necessary and would not be filed.

After reuniting all of CSP's children, CSP and DDC lived together briefly in the same house. However, they were soon driven apart by disagreements about the treatment of MJP, and by DDC's drinking. CSP became concerned when DDC, who had legal custody of MJP and FP because of the modification proceedings, said he might try to take them away from her. CSP claims this is the first notice she had that the modification had been filed with the court and custody was now with DDC. She shifted her alliance from DDC back to SG. SG took CSP to her attorney, Mr. Finn, who she had employed in the abandoned adoption proceeding.

Mr. Finn advised CSP that she had to return the children to DDC, and that her only means of keeping MJP would be to consent to adoption of MJP by SG. CSP signed the consent to adoption. However, she soon despaired of any action being taken by that route. Instead, she hired her trial counsel, Mr. Hjelmstad, to try to "straighten out the mess." On March 15, 1990, CSP filed a motion to modify the divorce decree and previous modification alleging that her previous consent to modification declaring DDC the father and granting him custody had been obtained by duress and fraud.

Meanwhile, the State of Wyoming had filed a petition to establish paternity and support for MJP on November 15, 1989. With the petition, CSP filed an affidavit naming GM as the father of MJP and stating that she had had a sexual relationship with GM during her marriage to DDC.

GM filed an answer to the petition stating that he was not the father of MJP. The State of Wyoming filed a motion to dismiss the petition when it learned that DDC had been declared the father in the earlier divorce modification.

Mr. Hjelmstad filed an objection to the State's motion to dismiss, contending that CSP's signature on the stipulation to modify the divorce decree had been obtained by fraud, duress and undue influence. On CSP's motion, the trial court consolidated the divorce and paternity cases, and ordered that paternity testing be performed. The tests showed that there was a 99.32% probability that GM was the father of MJP.

After a hearing and written submission of closing arguments, the trial court entered a decision letter on July 23, 1991. The court found that CSP had voluntarily entered into the stipulation declaring DDC the father of MJP, and that her actions were free of the influence of fraud and deception. It held that she was prevented from raising the issue of MJP's paternity by the doctrines of res judicata and collateral estoppel. After an order was entered on the court's decision letter, CSP took timely appeal to this court.

Appellant first argues that the stipulation she and DDC entered into was void for failure to comply with the procedural requirements of the Wyoming Parentage Act, W.S. 14–2–101 et seq. She claims that since the stipulation had the effect of adjudicating DDC's paternity of MJP, it was subject to the procedural rules for paternity actions. Specifically, appellant complains that the stipulation procedure was deficient in three respects: (1) MJP was not made a party to the action for paternity; (2) no guardian ad litem was appointed to represent her interests; and (3) no notice or opportunity to be heard in the paternity action was given to GM. See W.S. 14–2–107 (July 1986 Repl.).

■ We agree with CSP that the Wyoming Parentage Act provides the exclusive means of establishing the parent-child relationship between a child and his natural father. AEI v. JDM, 758 P.2d 22 (Wyo. 1988). There is no common-law authority

for determination of paternity. Blanton v. Warn, 444 P.2d 325, 327 (Wyo.1968). Compliance with the statutory procedure is mandatory in actions for adjudication of paternity. Matter of TLB, 771 P.2d 811, 813 (Wyo.1989). However, these rules do not apply where, as here, paternity of a child presumed to be a child of the marriage is determined in a divorce action by consent of the parties. In Matter of Paternity of JRW, 814 P.2d 1256, 1261 (Wyo. 1991), we stated that:

> While genetic testing, appointment of a guardian ad litem and an informal hearing are mandatory in the case of an initial, contested paternity determination, the Act does not mandate that the same procedures be used when paternity has already been established with the consent of the parties in a prior adjudication. * * * Where, as here, appellant and the mother agreed that the children were born of the marriage and this agreement was reflected in the divorce decree, there has been no violation of the mandatory language in the Act. The Act, as applied to the circumstances of this case, made appellant the "presumed father" and, as such, a blood test was not mandatory to establish paternity at the time of divorce. * * * [A]ppellant failed to exercise the statutory option of challenging his "presumed father" status in a parentage action joined with the divorce proceeding.

■ We believe this same rule applies to a proceeding to modify a divorce decree to include a child conceived during the marriage but born afterward. Modifications of the custody and support provisions of a divorce decree are provided for by W.S. 20–2–113 (June 1987 Repl.), which states in part:

> On the petition of either of the parents, the court may revise the decree concerning the care, custody, visitation and maintenance of the children as the circumstances of the parents and the benefit of the children requires.

■ The modification of a custody decree under this statute lies within the sound discretion of the trial court. Gaines v. Doby, 773 P.2d 442, 446 (Wyo.1989), and

cases cited therein. We will not disturb the modification unless there has been a grave abuse of discretion or violation of some legal principle. *See Roberts v. Vilos,* 776 P.2d 216, 217 (Wyo.1989). Courts in other jurisdictions have held that an action for custody and support of a child conceived during the marriage but born after the entry of a decree of divorce may be brought under a statute which authorizes modification of the decree, rather than under a paternity statute. *See e.g., Perkins v. Perkins,* 198 Neb. 401, 253 N.W.2d 42 (1977); *Moore v. Moore,* 231 Or. 302, 372 P.2d 981 (1962); *and see generally* Annotation, *Opening or Modification of Divorce Decree as to Custody or Support of Child Not Provided for in the Decree,* 71 A.L.R.2d 1370 § 19 (1960). We agree with the holding in these cases that the trial court has, as part of its continuing jurisdiction to modify a divorce decree, authority to declare valid a presumed parent-child relationship arising out of the marriage and to make orders of custody and support for the child conceived during the marriage, even after the divorce is final.

 The incidental fact that MJP was born within five months of the divorce rather than during the marriage did not strip the court of its authority to make provision for her as a child of the marriage. Since this determination was made pursuant to a stipulation by the parties in their divorce action, it was not necessary to comply with the procedural norms of the Wyoming Parentage Act. *JRW,* 814 P.2d 1256. To hold otherwise would open determinations of the parent-child relationship made in valid divorce decrees to unreasonable collateral attack on procedural grounds.

CSP argues, however, that we must hold the modification void because GM, the child's natural father, was deprived of his due process right to notice of the paternity proceeding when DDC and CSP stipulated to paternity rather than adjudicating it through a proceeding under the Wyoming Parentage Act. CSP has no standing to make this argument for GM. We note, in any case, that GM had no right to such notice; W.S. 14–2–107 (July 1986 Repl.)

governing notice states that "each man *presumed* to be the father under W.S. 14–2–102 and each man *alleged* to be the natural father may be made parties and shall be given notice of the [paternity] action * * *." GM was neither statutorily presumed to be the father of MJP, nor was he alleged to be her father in the petition for modification. Thus, he would not have been entitled to notice even had the proceeding been brought under the Act.

We hold that the stipulation and order entered upon it was not invalid or void for failure to comply with the procedural requirements of the Wyoming Parentage Act.

 In her next issue, CSP argues that the trial court erred in applying the doctrines of res judicata and collateral estoppel to her petition to modify her divorce decree. This issue also is governed by our decision in *Matter of Paternity of JRW,* cited above. In *JRW,* the presumed father of two minor children stipulated in a property settlement agreement that both children were the issue of his marriage to his ex-wife. When the State later sued him for failure to pay child support, he attempted to bring a petition to declare the non-existence of the father/child relationship, which the trial court dismissed. On appeal, we held that the father was barred from bringing the action by failure to commence it within a reasonable time. We also held that his action was barred by res judicata, collateral estoppel and judicial estoppel:

> Because of the potentially damaging effect that relitigation of a paternity determination might have on innocent children, the doctrines of res judicata and collateral estoppel are rigorously observed in the paternity context.
>
> \*      \*      \*      \*      \*      \*

In *Matter of Estate of Newell,* 765 P.2d 1353 (Wyo.1988), we identified the four criteria used to determine the applicability of res judicata. They are: " '(1) the parties were identical; (2) the subject matter was identical; (3) the issues were the same and related to the subject matter; and (4) the capacities of the persons were identical in reference to both the

subject matter and the issues between them.'" *Id.* at 1355 (quoting *Matter of Swasso*, 751 P.2d 887, 890 (Wyo.1988)). *JRW*, 814 P.2d at 1265.

In *JRW*, we found the *Newell* test satisfied under the circumstances. We also held that collateral estoppel was applicable because the paternity issue had been decided by stipulation of the parties and that judicial estoppel applied:

> The doctrine [of judicial estoppel] arises where, as here, the parties identified the children as "issue of [the] marriage" in the divorce proceeding. As defined in Black's Law Dictionary 761 (5th ed. 1979), judicial estoppel binds a party by his judicial declarations and he
>
> > may not contradict them in a subsequent proceeding involving [the] same issues and parties. * * * Under this doctrine, a party who by his pleadings, statements or contentions, under oath, has assumed a particular position in a judicial proceeding is estopped to assume an inconsistent position in a subsequent action.
>
> Thus, where appellant affirmatively asserted in the property settlement agreement that both children were "of [the] marriage," he is estopped from his current inconsistent claim that neither child is his.

*JRW*, 814 P.2d at 1265–66.

The same factors which made res judicata, collateral estoppel and judicial estoppel appropriate in *JRW* are applicable here: a parent's assertion that a child was born of the marriage, made in a divorce proceeding, which that parent later seeks to repudiate. CSP seeks to distinguish this case from *JRW*, in that she claims that DDC is barred from employing these doctrines because of his "unclean hands" in perpetrating a fraud upon the court and in obtaining her signature on the petition for modification through fraud.

■ With regard to the alleged fraud upon the court, we note that CSP was as guilty of "unclean hands" as was DDC. She knew that GM, rather than DDC, was the probable natural father of MJP when she signed the petition to be filed with the court. She also must have known that the purpose of the petition was to stop the adoption, rather than to act in the best interests of the child, if that was its purpose as she now claims. Therefore, we cannot countenance her claim now that DDC has unclean hands because what was filed with the court was false or misleading; she was as guilty as he. Additionally, if we must balance equities in this situation, MJP's interests as the innocent party weigh heavily in the balance. We will not lightly reverse a finding of her legitimacy in favor of a stranger to her parents' marriage. As was said in *Moore v. Moore*, 372 P.2d at 983:

> The fact that plaintiff purposely concealed her pregnancy from the court cannot militate against the child's right to be supported by its father. *In these proceedings the criterion for judgment is the child's welfare and not the fault of the parent.* [emphasis added]

■ CSP also claims that DDC has unclean hands because she was misled into signing the agreement through the ethical misconduct of DDC's attorney, Mr. Pickett. CSP claims that since Mr. Pickett was DDC's attorney, he could not adequately represent her conflicting interests in the modification action. She draws our attention to Wyoming Rule of Professional Conduct 1.7(b), which states:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

The evidence shows that Mr. Pickett did indeed represent both DDC and CSP in the

modification action. Regardless of what his formal agreements may have been concerning the representation, a representation of both parties was clearly created by implication. *See Adger v. State*, 584 P.2d 1056, 1060 (Wyo.1978) (representation may be created by implication). Whether such a representation is created depends on the facts and circumstances of each case. *Chavez v. State*, 604 P.2d 1341, 1346 (Wyo. 1979), *cert. denied*, 446 U.S. 984, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980). Here, the Verified Petition for Order Establishing Paternity, the Acknowledgement of Paternity, and the Stipulation to Modify Divorce Decree were all signed both by DDC and CSP and prepared by Mr. Pickett. Therefore, we conclude that a joint or common representation was created, and that Rule 1.7 applies.

Adherence to Rule 1.7 is especially important in the domestic relations context because

> [i]n a common representation, the lawyer theoretically owes *both* parties a duty of confidentiality and loyal and diligent representation. These duties conflict when the parties' interests are as diametrically opposed as in most divorce situations.

F. Gibbard and F. Hartmeister, *Mediation and Wyoming Domestic Relations Cases—Practical Considerations, Ethical Concerns and Proposed Standards of Practice*, XXVII Land & Water L.Rev. 435, 452–53 (1992) (emphasis in original; footnotes omitted).

 The trial court found that the joint representation did not justify setting aside the stipulation or the modification entered on it because: (1) CSP was fully advised of the consequences of signing the agreement; (2) she had an independent attorney available; and (3) she contacted that attorney before action was taken. The stipulation shows that CSP did, indeed, confer with an independent attorney prior to signing the agreement. However, we do not find any evidence of what Mr. Pickett told CSP, if anything, concerning the conflict of interest between her and DDC and the advantages and disadvantages of common representation. CSP claims he gave her no advice on these points.

The question before us is whether the modification ought to be set aside based on all the facts and circumstances surrounding the signing of the stipulation. As previously mentioned, CSP telephoned her attorney from Mr. Pickett's office prior to signing the agreement. She also consulted with him by phone outside Mr. Pickett's office on at least one other occasion, presumably concerning the stipulation. It must also be noted that the stipulation did benefit CSP, in that at the time she sought it, she was trying to reconcile with DDC and feared the adoption proceedings brought by SG. That circumstances would later ally CSP with SG and against DDC, might not reasonably have been anticipated when the stipulation was signed. We therefore hold that the opportunity to consult her own attorney, coupled with the benefit conferred on CSP, sufficiently removed any taint which may have been present due to the conflict-of-interest problem so that the modification must be allowed to stand.

In addition to its findings concerning the validity and preclusive effect of the prior modification of the divorce decree, the trial court specifically found that CSP failed to establish a change of circumstances which would justify a modification of the divorce decree and its earlier modification. Our review indicates that the trial court did not abuse its discretion in making this finding.

CSP's challenge to the agreement to modify is barred by res judicata, collateral estoppel, and judicial estoppel. Her petition to modify was properly dismissed.